Good morning, your honors, counsel, Edward Zafla on behalf of the petitioner, the appellant. Before I begin my arguments to the panel this morning, as I went through my briefs last night and I went through the material again since it's been a number of years, I realized something about my own nature in looking at these cases and I fall prey to kind of a callousness in looking at the medical and being very distanced from what actually happened in terms of the treatment for the injured party. And I know the court sees a lot of appeals and you see a lot of medical evidence and it can be overwhelming. And when I look back at the record here, I just want to emphasize that nowhere within this workers' compensation claim was there ever any real dispute about the nature and the extent of this gentleman's injuries. He had lifted the Christmas tree at work and sustained an annular tear at his L4, L5, and L5S1 disc. He was worked up diagnostically, it was recommended that he have surgery to L1 laminectomy and microdiscectomy. Now, immediately after his injury, he complained of low back and left leg pain. That left leg pain never abated. Throughout the entire history, up until the time of trial, he continued to experience the low back and left leg pain. Post the initial surgery, he did therapy. He did lumbar epidural steroid injections. They did further diagnostics that showed a recurrent herniated disc at the L5S1 level that they had operated on. It also showed a bulge at the level above it at L4, L5. The doctor, the neurosurgeon, recommended doing a fusion. And they did a fusion, the second surgery on this gentleman. They fused the L5S1, the one level fusion, pedicle screws were put in, and he continued to experience the low back and left leg pain postoperatively. In fact, he went into the hospital just a few weeks after the surgery because he had such severe pain. Well, you're right. I don't think that that was really disputed. Didn't this case really turn with the surveillance video that caused Dr. Goldberg to change his opinion as to when he reached maximum medical improvement? I mean, Goldberg sees the video of your claimant and basically opines that he thinks he was malingering, didn't he? Correct. Why can't Goldberg do that? He certainly is entitled to make any kind of inferences, subjective as they might be, from that videotape. But that doesn't invalidate the opinions that he held in April of 2006 when he examined the petitioner. When he examined the petitioner at that time, he said he's got L5S1 diminished sensation. He's got L5S1 active, and in the doctor's words, severe radiculopathy. Well, he may have impeached himself, but didn't he sort of say, yeah, I saw these diagnostic tests, but they did not conclusively establish objectively all of these problems that the claimant was relating. I was sort of basing it on his subjective expressions to me, and now I have a real problem with his credibility. Isn't he sort of saying that? I don't think he's saying the first part of that, which is I am not basing my opinions on the diagnostics. He looked at the MRIs. He looked at the EMGs. He looked at the myelograms and the CT scans. He had looked at all the diagnostics. And based upon that, he concurred with the other four physicians, the two pain physicians and the two neurosurgeons that operated on this gentleman, that he needed a spinal cord stimulator and should be off of work. You're right. Subsequent to that, he sees this videotape. I don't think anybody, any trier of fact, has seen that videotape. We certainly haven't seen it. Yeah. Why not? Haven't? We haven't seen it. I don't think anybody's ever seen it. Well, why haven't we seen it? Why isn't it part of the record? I think it is part of the record. I know counsel at the circuit court had moved to it. Well, you're the one that's responsible for giving us a record. It's not included in the record. It's not what I'm offering to evidence. It's not what I've admitted or put forth for evidence. Except for one problem. When you don't give us the videotape to view, we've got to assume that the conclusion reached by the commission is the correct conclusion. And when you look at it You haven't given us anything where we could even look at it to make a determination whether they were correct or they weren't. How do I prove a negative? What do you mean prove a negative? Show us the video. I don't have the videotape. I never put my hands on the videotape. I never saw it played a trial. And if we look at the commission's decision, it's absolutely scant on any mention of videotape. Well, when Sergeant Goldberg's cross-examination wasn't, during the surveillance he was observed sitting at a baseball game. He wasn't listening. He was walking without any difficulty, seen closing the trunk of the car. He entered into the driver's seat without difficulty. I did not see any facial grimacing when he was walking. He was walking without a limp. He was observed lifting the trunk of the car. Dr. Goldberg is the only one that saw the video. This gentleman was at a basketball game. This gentleman filled his vehicle at a gas station and he was shopping with his children. What I'm saying is, although I'm frustrated by the fact that the commission in any trier of fact here hasn't seen that videotape and only Dr. Goldberg has seen it, how does the activities, which are not in excess of his sedentary work restrictions, none of those activities described by Dr. Goldberg, invalidate his ongoing low back and left leg pain? Oh, yes, it does. Goldberg turns around and says, I gave you my opinion earlier based upon what I saw when I examined him. What I saw on the video is inconsistent with the complaints that he made when he was in my office. What happened to? He was listening. He wasn't listening. What happened to his radiculopathy that the doctor objectively in his neurological examination says was there on April 2006? The same day as the video, by the way. What happened to the diminished sensation at L5S1 that the doctor objectively says was there? What do you mean objectively says was there? He didn't say it was objectively. He based it on subjective complaints and what he saw when he examined him. The way the man moved, the way the man walked, and he was listening to one side. He turns around and says, I saw this video. There was no more listening. He wasn't in pain. And he was doing all sorts of stuff. And based on that, I've changed my opinion. So this gentleman's fusion, this gentleman's ongoing low back and left leg pain that's been documented, that's been diagnostically, objectively verified. He didn't recover 40 percent of a man's old. When this gentleman gets to that point in April, May of 2006, he's already asked for job accommodation. He's asked to go back to work with those restrictions. He's asked for a vote. He's asked for maintenance. He's even asked for a functional capacity evaluation, all of which this insurance company has denied despite his inability to go back and do what he did before. So in the light of that, the doctor's going to look at the videotape and say, hey, we're through with this gentleman. No more benefits. If Goldberg opined that he reached maximum medical improvement, he could return to his previous work. Based upon what he saw in that video, we don't have the video. Evidently, the commission bought Goldberg's testimony. We don't know because they don't refer to it whatsoever. Well, they certainly affirmed. They affirmed what the arbitrator did, didn't they? They say there's no causal connection proven for the medical treatment after May of 2006, which is when Goldberg revised his opinions after seeing the videotape. Well, clearly implicit in that is that they must have believed Goldberg. Otherwise, why would they come to that conclusion? Understood. And what I'm saying is if anybody were to look at that video, if any of us could see what those activities are, none of those activities are the type that exceed his restrictions that were given to the doctor after these two surgeries. I can appreciate where you're at. To be very blunt, you're sort of in a catch-22, but what my learned colleague has just suggested is accurate. Goldberg is giving his opinion based on a video that he's seen and nobody else has seen. I understand why would you prompt for a video? It doesn't help your case, does it? If anything, it undercuts your case. So you want to stay away from that normally as an advocate. However, when you think back now in hindsight, it leaves you with a trick bag because, as he says, if the commission relies on it, we have to assume in the credibility determination that that was okay because you have given us nothing for us to determine that the video contradicts Goldberg's opinion because it's not in evidence. Well, the only evidence that would exist would be my cross-examination of Ed Goldberg. And again, I go back to what does the doctor describe as on that videotape versus what were this gentleman's restrictions? He's got 15 pounds. The videotape was not available. You couldn't get the videotape? I was never given the videotape prior to trial. I don't ask if you ever got it. Could you have gotten it? My opponent had moved in the circuit court for admission of a videotape into the record to supplement it. An order was entered. I assumed it was done at that time at the circuit court before Judge Tolmere. You certainly had an opportunity to see it. I saw it. Yeah, I did see it. But the point is that any perceived defect that there was on my part was cured when Respondent's Counsel went into court and moved to amend or supplement, rather, the record. And that videotape was proffered and it was admitted before Judge Tolmere. Yeah, except for one thing. Who was responsible for filing the record before us? You were. My opponent. Who was supposed to make sure that that videotape, if you wanted it before us, was in the record when you filed it? You were. That's your opponent. It may very well have been introduced in the evidence in front of, in the circuit court, but you never furnished it to us as part of the record on appeal. We can't view it because you didn't give it to us. Now, what do you want us to do about it? It's clearly a manifest way of the evidence standard. And what I'm suggesting is with the evidence before the court and looking at the testimony of Dr. Beberan, Dr. Assam, the two pain physicians, Dr. Lamme and Dr. Panschow, the two neurosurgeons, that in looking at that manifest way to the evidence, it contradicts the conclusions made by Dr. Goldberg. The other issue I have here is not a factual issue. It's a legal issue. And that's the subsequent incident in 2007. Subsequent incident that the commission deemed to be a new accident. And I submit if you look at the medical testimony, this gentleman continued to have low back and left leg pain. He did not have any abation of that problem. He was on methadone up until the point in time where he went and found another job on his own. He was treating with Ultram and methadone to keep the pain at bay. Then in February of 2007, he has a history where he goes to the hospital and says, well, I got chronic low back pain. He went to Dr. Panschow and said, I was working in a chair when I suddenly felt severe, ridiculous left leg pain. This is a vogal situation. We don't have a new accident that breaks the chain of causation. We don't have a new injury whatsoever. We don't even have a traumatic event. All we have is the ongoing aggravation of this gentleman's underlying low back and left leg condition. It's a legal question. Based upon the incident that he had in February of 2007, I'm looking for the medical treatment for that period. I'm looking for the short period of total, temporary total disability benefits, temporary partial disability benefits, as well as in light of the Court's ruling on the issue of the aggravation in 2007, I think the permanency award needs to be revisited by the trier of fact. Thank you. Thank you. Counsel, please. Good morning. My name is Patrick Grady. I'm here on behalf of the Respondent. Counsel, may it please the Court. I think the central analysis that we have to work on today is was the evidence on which the arbitrator, commission, and ultimately the circuit court rely on sufficient to sustain their decision? We don't get to the question of whether the arbitrator, commission, or circuit court's decision or Petitioner's decision is clearly evident until we examine thoroughly that is what the commission relied on. And as the Court or the panel has already observed, the videotape seems to be a central issue in this matter or a central piece of evidence. Well, it does. And I think we've touched on it quite extensively. Obviously, based on the evidence that we've seen, the court has modified his opinion. That's not in dispute. His response is, I think it's a fair argument, well, yeah, okay, let's assume that the video depicted what Goldberg says it does, recognizing it's not in evidence and recognizing it should be in evidence. He's saying that the activities that Goldberg talks about are really not inconsistent with the sedentary work restriction. He's saying that the video, according to Goldberg, doesn't show anything that would rise to the level of any unusual physical exertion consistent with what was testified to about his condition. So how do you respond to that? I think there's a couple points, if I may. First of all, it is not only the videotape that I would suggest motivated Dr. Goldberg to change his position. During the examination, he looked at some x-rays and myelograms. It indicated that the fusion was consistent with what Goldberg testified to. That I was completely healed, that there was no evidence of compression, nerve compression, that there was no muscle atrophy, which is a symptom of nerve compression, and there were no spinal cord abnormalities. That being said, Dr. Goldberg testified that he relies a lot or to a significant amount on what the patient tells him. The patient tells him that I am suffering severe low back pain that's radiating into my leg. And he observes a patient who can't sit still because he has to shift to avoid nerve pain, has difficulty getting up onto an examination table, walks with a limp, and then sees the videotape totally inconsistent. I don't think the question has anything to do with whether what is observed on the tape is within or outside of the petitioner's work restrictions. I think it has everything to do with the pain presentation and the analysis or what that infers to a doctor in terms of whether this patient can go back to work as a bank employee, whether this patient has reached MMI from his back surgeries, or whether this patient needs a back stimulator. Irrespective of restrictions, if a patient's not suffering low back pain, he doesn't need a stimulator. Doctors won't prescribe him a stimulator. If he's not suffering from back pain, as he represented in his examination with Dr. Goldberg, and otherwise in his examination with Dr. Goldberg, and otherwise can go back to work as a bank employee, he can go back to work as a bank employee. Did Goldberg specifically testify that he felt that the claimant was a malingerer? Did he actually use that term? No, he did not. He did not. He implied a questioning of what the petitioner presented to him in terms of his pain, discomfort, and what he can and cannot do during the examination. Well, based on that, he clearly implicitly found that the claimant had been exaggerating his symptoms. Again, the doctor didn't use those words. I would use those words. And I think it's important. The fact that Dr. Goldberg testified and then changed his mind based on what he saw on that tape, I think that lends a tremendous amount of credibility when the arbitrator explains the reason why he finds Dr. Goldberg's testimony more credible than that of the treating physicians, is the treating physicians did not see this tape. They were not exposed even to a report of this case. So I think in the arbitrator's decision, he references viewing the tape. So to answer, Justice Hoffman, you're implying a question to counsel. It appears that he viewed the tape. So I think it's not a question so much as can he do all of these things on the tape. Within his restrictions, it's a question of what does the tape tell you about his presentation and what does that say about his ability to return? Well, Goldberg testified that his reevaluation of the condition wasn't based on the level of activity observed, but rather between the inconsistency between the behavior in the tape and the behavior during his medical examination. That's what he testified to. I believe that is correct. I mean, I think that says it all without saying he's a malinger, without saying he's misrepresenting anything. I think that says everything that needs to be said about his position. And I believe that the arbitrator commissioned and ultimately the circuit court were proper to rely on Dr. Goldberg's opinions, his findings, as well as the videotape in their determinations to the benefits that this gentleman was entitled to. Beyond the videotape, there are a couple of issues. I think the maintenance issue is one that we can address quickly. National T says there's a two-part test. Will you increase or do you have a good likelihood of increasing your compensation through that test? Well, I think we don't even necessarily get to the analysis, because there's no evidence that any loss in earning capacity was proven by the petitioner when he is released to go back to work at his job at the bank. So on several levels, first of all, we don't see a loss of earning capacity. Second of all, there is no loss of capacity. He has a good chance of going back to work at his job at the bank. And third of all, he has a good chance of going to his other job. So I believe that issue in terms of not only the rehabilitation, but the necessary maintenance benefits that would attach to it, I believe the commission was appropriate in denying those benefits. I think the intervening cause is an interesting concept. The second accident or event, if you will, we don't, we're not claiming it's an intervening event. Truly, the intervening event is the videotape and the decision by Dr. Goldberg that's adopted by the commissioner that the petitioner reached MMI on May 11th. That pretty much cuts it off. Unless the court has additional questions for me or which to... Thank you, counsel. Thank you very much for your time. The fact that the petitioner reached MMI doesn't preclude him from having medical treatment and problems in the future that need to be addressed. We go from a fundamental leap of this gentleman having two surgeries, not being able to get back to work, the decision by Dr. Goldberg to do a one-two punch on him. They set him up for an IME, legitimate, no problem, but they know he's going to be down there and they set up the video camera. All they have to rely upon here is that surveillance video and the opinions of Dr. Goldberg. The arbitrator kind of depended upon that video too, didn't he? No. I've read the decision by the arbitrator. All they have to rely on is the testimony of Dr. Goldberg. He does not comment, as counsel said, that he viewed the video surveillance. Well, so when I'm incorrect when the disposition says the arbitrator having reviewed the surveillance video? I'm sorry, Your Honor, what page is that? I'm not going to tell you. You tell me what it says. Please proceed. I'm referring to page four of the decision by Dr. Goldberg. Page four, last paragraph of the arbitrator's decision. And he states he doesn't find petitioner's complaints of pain to be credible. He says he made repeated representations to Panchal Patel, Dr. Lammy, Dr. Beverend, and Dr. Goldberg of ongoing complaints of low back and radiating leg pain. The surveillance video of March and April belie petitioner's representations, particularly representations he made to Dr. Goldberg. I want to read the next paragraph on the next page. I didn't see that, Your Honor. Clearly states that the arbitrator viewed the videotape. Being that the case, and more importantly, with Dr. Goldberg having looked at the videotape, I don't see how that cancels out the very clear opinions of the two pain specialists and the two neurosurgeons that treated this gentleman. Well, the arbitrator, by looking at it, questioned the claimant's credibility. Is that correct? He did. And that's because it was raised as an issue by Dr. Goldberg in viewing the videotape. But this gentleman's low back and left leg pain did not suddenly disappear because of this videotape. Well, he had worked for the employer, what, four or five months, went to work in December of 03, correct? But when Dr. Panchel had released him, he states at that time in 2004, I expect this gentleman may continue to have back pain and leg pain for a long time. I believe the current condition is permanent, particularly the lumbar radicular pain and the back pain. His need for the spinal cord stimulator existed before the videotape. It existed after the videotape. And that low back and left leg pain never went away, despite the opinions of Dr. Goldberg in looking at the videotape. Medical evidence should trump this videotape, particularly when Dr. Goldberg takes no issue with any of the objective diagnostic tests. The last issue that I wanted to comment on was an issue raised with the testimony of the claims rep who testified here. The period of medical that the commission awarded was modified on the review. But they did not award the rough evaluation. It was roughly $14,000, $15,000 of medical treatment that was written off by contractual allowance. The claims rep testified she had no idea if there was any contractual adjustment that was contracted between the provider and the insurance company. Was this the medical insurance provided by the employer? This is the workers' compensation period. Well, I understand, but the insurance that paid the bills that resulted in some write-offs, some kind of contractual write-offs, that was through workers' comp? That was through workers' comp. It wasn't a third party and it wasn't employers' group. It wasn't employers' group. And so I put the question to the claims rep, are there any contractual allowances? Is there any contract that would support this write-off and reduction for allowances? She had absolutely no proof and no understanding of what contractual allowances existed. Who were the balance shown on the bills? Balances are roughly $14,000. Did they award the balances? I'm sorry. They awarded the balances on the bills after the adjustment. After the reduction of the $14,700 of adjustments. So the bill says that's the balance. Those providers expect him to pay those contractual write-offs. Who says they require him to pay those? Because they still show up on the bill. They don't show zero. Even if we take that balance, it still shows both of those amounts due and owing on the bill. Did you get an award for the balance shown on those bills? Yes.